**FILED**

**May 7, 2024**

C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**Gregory Gwinn,**
**Claimant Below, Petitioner**

**v.)**     **No. 22-629**     **(**BOR Appeal No. 2057921)
                              (JCN: 2018027737)

**Lewis Chevrolet Company,**
**Employer Below, Respondent**

## MEMORANDUM DECISION

Petitioner, Gregory S. Gwinn, appeals the decision of the West Virginia Workers' Compensation Board of Review ("Board of Review"). Respondent, Lewis Chevrolet Company, filed a timely response.[1] The issue on appeal is the compensability of the claim. Mr. Gwinn argues that he was exposed to chemicals, paints, and solvents, and that such exposure contributed to a significant degree to his development an occupational disease. The claim administrator rejected Mr. Gwinn's claim on July 30, 2018. The Workers' Compensation Office of Judges ("Office of Judges") affirmed the claim administrator's decision on January 24, 2022, and the order of the Office of Judges was affirmed by the Board of Review on June 30, 2022. Upon our review, we determine that oral argument is unnecessary and that a memorandum decision affirming the Board of Review's decision is appropriate. *See* W. Va. R. App. P. 21.

Mr. Gwinn worked as a paint technician for various automobile dealerships from 1992 until February 13, 2018, when he filed a workers' compensation claim alleging he developed Parkinson's Disease ("PD") because of his employment. As a result of his paint technician work, he alleges that he experienced both inhalation and dermal exposure to paints, solvents, primers, and various chemicals during his employment. The physician's portion of the application was completed by Paul Ferguson, M.D., who opined that Mr. Gwinn acquired PD as an occupational disease. By order dated July 30, 2018, the claim administrator denied Mr. Gwinn's application for workers' compensation benefits, and Mr. Gwinn protested the decision.

Prior to being diagnosed with PD by Dr. Ferguson, Mr. Gwinn complained of neurological issues and sought treatment with Barry Vaught, M.D. in 2010. Dr. Vaught noted that Mr. Gwinn had been having trouble with head movements, and other neurological symptoms, beginning at

---

[1] Petitioner, Gregory S. Gwinn, is represented by R. Dean Hartley, and the respondent, Lewis Chevrolet Company, is represented by T. Jonathan Cook.

1

age seven and increasing in frequency ever since. A neurological examination was performed and declared to be normal, and Dr. Vaught did not observe evidence of movement disorders during a visit on April 20, 2010. Mr. Gwinn was referred for a second opinion on August 2, 2010, with Rital Gandhy, M.D., who believed that Mr. Gwinn's limb movements were either related to tics, Tourette syndrome, or a conversion disorder. As a result, Mr. Gwinn was prescribed Risperdal, which made his tics less severe.[2]

In support of his protest, Mr. Gwinn submitted records from Marshall Health Center dated February 1, 2015, through February 2, 2018. The records indicated that Dr. Ferguson first saw Mr. Gwinn on May 11, 2015. After reviewing his history, Dr. Ferguson performed a physical examination and noted that Mr. Gwinn presented with signs and symptoms of PD. Mr. Gwinn was diagnosed with PD based upon observed symptoms of parkinsonism, and he began treatment with the medication Sinemet.[3] In a record dated June 11, 2015, it was reported that Mr. Gwinn had a "robust" response to the treatment.

Mr. Gwinn submitted testimony taken at his deposition on May 9, 2018, through May 11, 2018, and on June 25, 2018. He discussed his medical history, work history, his work conditions, and his exposure to the products he used during his employment. Mr. Gwinn stated that he did not have a family history of PD, and Dr. Ferguson was the first physician to diagnose and treat his PD. According to Mr. Gwinn, his symptoms of tremors in the hands and legs, and excessive sweating were under control with medication. The symptoms of leg pain and stiffness, fatigue, trouble sleeping, and memory problems began prior to 2010.

The employer submitted the independent medical evaluation report of Christopher Martin, M.D., dated October 8, 2018. Dr. Martin stated, "I do not believe the evidence supports to a reasonable degree of medical certainty that this man has developed Parkinson['s] disease or other neurological disorder as a result of his past occupational exposures as an automotive paint technician." Dr. Martin was puzzled by Mr. Gwinn's symptoms because the neurological examination was completely normal. Dr. Martin stated:

> The abnormalities documented by Dr. Ferguson are very subtle, and markedly disproportionate to the degree of symptoms, self-reported disability and current medical therapy received from Mr. Gwinn. It is recognized that Parkinson disease has a prodromal phase during which non-motor clinical features as well as physiological abnormalities may be present prior to the onset of more classical and obvious motor signs. Such symptoms include olfactory deficits, constipation, sleep disorders, depression and anxiety, which Mr. Gwinn reports. However, he describes many additional symptoms such as diffuse pain not a typical sign in Parkinson

---

[2] Risperdal is an antipsychotic medication that is used to treat certain mental/mood disorders by changing the effects of chemicals in the brain.

[3] Sinemet is combination medication used to treat symptoms of PD or Parkinson-like symptoms. Dr. Ferguson testified that the medication is the "gold standard" for PD treatment.

disease. Moreover, I would expect these symptoms to have evolved to motor signs by now.

Dr. Martin was not able to reconcile how Mr. Gwinn experienced progressive symptoms for at least nine years without presenting with neurological abnormalities during the examination. Because there was disagreement among the neurologists who assessed Mr. Gwinn about his symptoms, Dr. Martin recommended an additional opinion as to whether or not Mr. Gwinn has PD.

At a deposition conducted on December 18, 2018, Dr. Ferguson testified that when he first saw Mr. Gwinn, he observed "right upper limb resting tremors, poor arm swing, some bradykinesia, and rigidity," which are the hallmark manifestation signs of PD. It was noted that the common risk factors for PD include family history, age, ethnicity, recurrent head trauma, and occupational risks. Although Dr. Ferguson was not aware Mr. Gwinn was diagnosed with polyneuropathy and sought treatment for alcoholism, he concluded that Mr. Gwinn had the clinical symptoms of Parkinsonism. Dr. Ferguson reported that it is uncommon for people to develop PD at such a young age and considered if there could be an occupational association. Dr. Ferguson further testified that he was not aware of any link in the medical, scientific, or epidemiological literature between painters and PD. On the application for benefits, the answer to the question "Is the disability work related?", was marked "no." However, Dr. Ferguson testified that the application was incorrect, and the question should have been marked, "yes." It was concluded that Mr. Gwinn's exposure could be associated with his condition and that he had no identifying risk factors.

Michael Sellman, M.D., a neurologist, prepared a record review on July 5, 2020, indicating that Mr. Gwinn may have a hereditary movement disorder that has been present since he was seven years of age. Dr. Sellman reported that Mr. Gwinn has had sixteen examinations in the Neurology Department at Marshall Health Center in Huntington, West Virginia, between the dates of August 2, 2010, and June 18, 2018. The notes from those examinations do not document that this "gentleman had tremor, rigidity, significant bradykinesia, or problems performing rapid alternating movements." Dr. Sellman agreed with Dr. Martin that there was no objective documentation of any progression of Mr. Gwinn's neurological disorder, and it was concluded that the reviewed records do not confirm a diagnosis of PD. However, if Mr. Gwinn was found to have the diagnosis of PD, Dr. Sellman opined that it started prior to 2013 because he presented for initial neurological evaluations in 2009 and 2010.

Medical reports of Ann M. Murray, M.D, dated February 5, 2020, indicate that Mr. Gwinn sought treatment because his gait had changed, along with additional rigidity in his neck and shoulders. It was noted that Mr. Gwinn's primary symptoms were non-intrusive resting tremor, short term memory impairment, fatigue, stiffness, slow activity, and poor sleep with rapid eye movement. Regarding the clinical assessment, Dr. Murray stated Mr. Gwinn had no objective clinical findings of PD; however, this could be secondary to being treated with Parkinson's medication which could be masking the clinical findings. It was reported that Mr. Gwinn's history could be consistent with PD, but it could also be consistent with other diseases. Dr. Murray stated that:

it is possible that long term exposure to chemicals at work contributed to symptoms, as being exposed to organic solvents is thought to be a possible risk factor in the development of Parkinson's disease. However, the degree of causation from this exposure to the development of the disease is a much harder thing to prove/suggest.

On November 10, 2020, Mr. Gwinn underwent a NUC Brain DAT SPECT,[4] which revealed a mild radiotracer abnormality decreased putaminal activity on the right, and symmetrically reduced uptake in the caudate nucleus. Gerard Deib, M.D., opined that the findings were in keeping with a neurodegenerative process such as Lewy Body Dementia or PD with neurocognitive features.

Robert J. Harrison, M.D., conducted a live video consultation with Mr. Gwinn on April 8, 2021. No physical examination was performed. In his report, Dr. Harrison noted that Mr. Gwinn has a history of movement abnormality dating from 2010 with suggestion in the records that this may have started in his childhood. Dr. Harrison concluded within a reasonable degree of medical probability that Mr. Gwinn developed PD, and that his exposure to solvents was a significant contributing factor to the development of the condition. Dr. Harrison opined that the linkage to PD is strongest for trichloroethylene exposure.

Mr. Gwinn submitted an article from Briana R. DeMiranda, Ph.D., dated June 14, 2021, explaining the mechanisms of PD. Dr. DeMiranda reported that PD is a progressive, neurodegenerative disorder that causes both motor and non-motor disease symptoms. It was also reported that 85% of PD cases are considered idiopathic, with no known genetic mutations that increase inherited risk for the disease, which suggests that environmental exposures can heavily influence the risk for PD. In her report, Dr. DeMiranda stated that there are two hallmark pathologies of PD, which are: (1) the loss of dopamine producing neurons from the substantia nigra and their axon projections to the caudate putamen, and (2) intracellular protein accumulation called Lewy bodies. It was Dr. DeMiranda's opinion that pesticides, metals, and industrial solvents could increase the risk for PD, along with chlorinated solvents and trichloroethylene's.

In a final decision dated January 24, 2022, the Office of Judges found that Mr. Gwinn failed to offer proof to establish a statutorily acceptable diagnosis of PD within the meaning of West Virginia Code § 23-4-1(f). The Office of Judges noted that four neurologists had examined Mr. Gwinn (Dr. Vaught, Dr. Gandhy, Dr. Murray, and Dr. Ferguson), and all but one (Dr. Ferguson) found no objective physical examination findings consistent with PD. Dr. Ferguson rendered a diagnosis of PD; however, inconsistencies were found with his physical findings. Thus, based upon the findings of Drs. Vaught, Gandhy, and Murray, the Office of Judges determined that the evidence does not establish a clinical diagnosis of PD for the purpose of proving compensability in the claim, and the claim administrator's order dated July 30, 2018, was affirmed. The Board of

---

[4] A NUC Brain DAT SPECT is a nuclear imaging test that allows doctors to view the brain's dopamine levels and determine whether the brain's neurons have degenerated. This gives physicians the ability to accurately diagnose Parkinsonian syndrome in patients.

Review adopted the findings of fact and conclusions of law of the Office of Judges and affirmed the decision on June 30, 2022.

This Court may not reweigh the evidentiary record, but must give deference to the findings, reasoning, and conclusions of the Board of Review, and when the Board's decision affirms prior rulings by both the Workers' Compensation Commission and the Office of Judges, we may reverse or modify that decision only if it is in clear violation of constitutional or statutory provisions, is clearly the result of erroneous conclusions of law, or is based upon a material misstatement or mischaracterization of the evidentiary record. *See* W. Va. Code § 23-5-15(c) & (d). We apply a de novo standard of review to questions of law. *See Justice v. W. Va. Off. Ins. Comm'n*, 230 W. Va. 80, 83, 736 S.E.2d 80, 83 (2012).

In order to establish compensability, an employee who suffers a disability in the course of his employment must show by competent evidence that there was a causal connection between such disability and the employee's employment. Syl. Pt. 3, *Deverick v. State Compensation Director*, 150 W. Va. 145, 144 S.E. 2d 498 (1965). Ordinary diseases to which the general public is exposed outside of employment are not compensable, except when they follow as an incident of occupational disease. Mr. Gwinn alleges that his PD is an occupational disease which was incurred in the course of and resulting from his employment. West Virginia Code § 23-4-1(f) states, in part, that

> a disease is considered to have been incurred in the course of or to have resulted from the employment only if it is apparent to the rational mind, upon consideration of all the circumstances: (1) That there is a direct causal connection between the conditions under which work is performed and the occupational disease; (2) that it can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment; (3) that it can be fairly traced to the employment as the proximate cause; (4) that it does not come from a hazard to which workmen would have been equally exposed outside of the employment; (5) that it is incidental to the character of the business and not independent of the relation of employer and employee; and (6) that it appears to have had its origin in a risk connected with the employment and to have flowed from that source as a natural consequence, though it need not have been foreseen or expected before its contraction[.]

On appeal, Mr. Gwinn argues that his submitted evidence demonstrated a diagnosis of PD with tremors, showing: (1) That there is a casual connection between Mr. Gwinn's work exposure to chemicals, paints, and solvents, and his young-onset PD; (2) That can be seen to have followed as a natural incident of his work history as a result of the exposure occasioned by the nature of the employment; (3) That can be fairly traced to the employment as the proximate cause; (4) That it does not come from a hazard to which workmen would have been equally exposed outside of the employment; (5) That is incidental to the character of the business and not independent of the relation of employer and employee; and (6) That it appears to have had its origin in a risk connected with the employment and to have flowed from that source as a natural consequence, though it was not foreseen or expected before contraction.

To the contrary, after review we agree with the reasoning and conclusions of the Office of Judges, as affirmed by the Board of Review. To establish that his PD resulted from occupational exposure, Mr. Gwinn must first demonstrate that he in fact has a diagnosis of PD. Although Mr. Gwinn depends on Dr. Ferguson's opinion to establish a diagnosis of PD, the Office of Judges found Dr. Ferguson's testimony to be inconsistent with his own treatment records. Based upon those inconsistencies, the Office of Judges determined that Dr. Ferguson was unable to diagnose one clinical symptom of PD in his clinical notes. Contrarily, Dr. Martin, who conducted a neuropsychological examination and a review of the medical literature, concluded that the condition was not supported by the evidence in this claim. Therefore, the substantial evidence of record supports the decision of the Board of Review that Mr. Gwinn failed to offer sufficient proof to establish a statutorily acceptable diagnosis of PD within the meaning of West Virginia Code § 23-4-1(f).

Affirmed.

**ISSUED: May 7, 2024**

**CONCURRED IN BY:**

Chief Justice Tim Armstead
Justice Elizabeth D. Walker
Justice John A. Hutchison
Justice C. Haley Bunn

**DISSENTING:**

Justice William R. Wooton

Wooton, Justice, dissenting:

I respectfully dissent. A fair review of the record in this case demonstrates that Claimant/Petitioner Gregory Gwinn ("Mr. Gwinn") established by a preponderance of the evidence that he suffers from Parkinson's Disease as a result of inhalation and dermal exposure to paints, solvents, primers, and various chemicals during the course of his employment. His claim was supported not only by his own testimony but also by his medical records; the testimony of his primary treating physician, Dr. Ferguson; the opinion of Dr. Delb, who concluded that the results of a 2020 nuclear imaging test were consistent with Lewy Body Dementia or Parkinson's Disease with neurocognitive features; a report from Dr. Harrison, who opined that Mr. Gwinn had developed Parkinson's Disease and that his exposure to solvents was a significant contributing

factor; and a scientific journal article[5] linking pesticides, metals, and industrial solvents to an increased risk for development of Parkinson's Disease.

A report from treating physician Dr. Murray was, at worst, somewhat equivocal, finding that although Mr. Gwinn had no objective clinical findings of Parkinson's Disease, such findings could be "masked" by the Parkinson's medication he was taking; and that although exposure to solvents "is thought to be a possible risk factor in the development of Parkinson's disease. . . . the degree of causation from those exposure to the development of the disease is a much harder thing to prove."

In response, the employer presented an IME report from Dr. Martin and a record review report from Dr. Sellman, both of whom concluded that Mr. Gwinn's evidence did not support his claim to a reasonable degree of medical certainty.

The Claims Administrator denied Mr. Gwinn's claim, crediting the opinions of the forensic experts over all of Mr. Gwinn's medical evidence, including the opinions of his treating physicians, and this denial was affirmed by the Office of Judges, the Board of Review, and now this Court. I am aware that the standard of review in workers' compensation cases is narrow and that we, as appellate judges, are not to reweigh the evidence. In this case, however, I cannot fathom how a reasonable factfinder could find that Mr. Gwinn's evidence did not preponderate, or conversely, that the employer's evidence *did* preponderate. At the least, this case falls under the provisions of West Virginia Code section 23-4-1g, which provides, in relevant part, that "[i]f, after weighing all of the evidence regarding an issue in which a claimant has an interest, there is a finding that an equal amount of evidentiary weight exists favoring conflicting matters for resolution, the resolution that is most consistent with the claimant's position will be adopted."

For these reasons, I respectfully dissent. I would put this case on the Court's Rule 19 docket for a closer look at the record as well as an analysis more firmly grounded in our precedents.

---

[5] Briana R. DeMiranda, et al., *The Industrial Solvent Trichloroethylene Induces LRRK2 Kinase Activity and Dopamine Neurodegeneration in a Rat Model of Parkinson's Disease*, 153 NEUROBIOLOGY OF DISEASE 105312 (June 2021).